Nos. 25-2147,
25-2136, 26-1008

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff/Appellee/Cross-Appellant,*

v.

KEVIN GILES,
*Defendant/Appellant/Cross-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

_____

BRIEF OF APPELLANT GILES

_____

JOSEPH MEDICI
Federal Public Defender

Kevin M. Schad
Attorney for Appellant/Cross-Appellee
Appellate Chief
FPD Southern District of Ohio
250 E. Fifth St.
Suite 350
Cincinnati OH 45202
(513) 929-4834
Kevin_schad@fd.org

TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT REGARDING ORAL ARGUMENT ...............................................1

STATEMENT OF THE ISSUES....................................................................2

STATEMENT OF THE CASE ......................................................................3

SUMMARY OF THE ARGUMENT ...............................................................17

I.     AFTER DISMISSING COUNT 4, THE DISTRICT COURT SHOULD HAVE DETERMINED THAT RETROACTIVE MISJOINDER REQUIRED A NEW TRIAL ON THE REMAINING COUNTS.........................................................................................19

II.    THE CONVICTION ON COUNT 3 OF THE INDICTMENT MUST BE VACATED ...................................................................................23

    A.    The Government failed to prove force, threats of force, fraud, or coercion as to AV-1 ......................................................24

    B.    The verdict was against the manifest weight of the evidence ......26

    C.    A conviction under 18 U.S.C. § 1591(a) where the victim is an adult but not a subject of slavery is improper ........................27

III.   THE COURT SHOULD HAVE HELD A FRANKS HEARING ...............31

IV.   BECAUSE OF IRREGULARITIES IN THE DISCOVERY PROCESS, GILES WAS DENIED A FAIR TRIAL ...............................37

    A.    Evidence from the Wyze camera ...................................................38

    B.    The second CPS worker ................................................................42

    C.    Evidence from cell phones ............................................................44

    D.    Remedy.............................................................................................44

CONCLUSION ........................................................................................46

CERTIFICATE OF COMPLIANCE................................................................47

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States,*
    487 U.S. 250, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988) ...........................35

*Bond v. United States,*
    572 U.S. 844, 134 S. Ct. 2077, 189 L. Ed. 2d 1 (2014) ...............................30

*Brady v. Maryland.*
    373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) .................................38

*Butler v. City of Detroit, Michigan,*
    936 F.3d 410 (6th Cir. 2019)...................................................................32

*Chancellor v. Geelhood,*
    168 F.4th 388 (6th Cir. 2026) .................................................................38

*Dale v. United States,*
    517 F. App'x 421 (6th Cir. 2013) .............................................................21

*Dubin v. United States,*
    599 U.S. 110, 143 S. Ct. 1557, 216 L. Ed. 2d 136 (2023) ...........................28

*Franks v. Delaware,*
    438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) .................................32

*Glossip v. Oklahoma,*
    604 U.S. 226, 145 S. Ct. 612, 221 L. Ed. 2d 90 (2025) ..............................34

*Moore v. Rubin,*
    160 F.4th 271 (2d Cir. 2025)...................................................................24

*Rehberg v. Paulk,*
    566 U.S. 356, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (2012) ...........................34

*Reichert v. Kellogg Co.,*
    170 F.4th 473 (6th Cir. 2026) .................................................................29

*United States v. Afyare,*
632 F. App'x 272 (6th Cir. 2016) ........................................29

*United States v. Aldridge,*
98 F.4th 787 (6th Cir. 2024) ........................................25

*United States v. Ardd,*
911 F.3d 348 (6th Cir. 2018) ........................................32

*United States v. Azad,*
809 F.2d 291 (6th Cir. 1986) ........................................35

*United States v. Ballinger,*
155 F.4th 671 (6th Cir. 2025) ........................................26

*United States v. Betro,*
115 F.4th 429 (6th Cir. 2024) ........................................23

*United States v. Brown,*
732 F.3d 569 (6th Cir. 2013) ........................................31

*United States v. Daniels,*
163 F.4th 992 (6th Cir. 2026) ........................................44

*United States v. Davis,*
84 F.4th 672 (6th Cir. 2023) ........................................33

*United States v. Deakins,*
152 F.4th 693 (6th Cir. 2025) ........................................23

*United States v. Ford,*
821 F. App'x 742 (9th Cir. 2020) ........................................24

*United States v. Fowler,*
535 F.3d 408 (6th Cir. 2008) ........................................32

*United States v. Harney,*
934 F.3d 502 (6th Cir. 2019) ........................................37

*United States v. Jackson,*
918 F.3d 467 (6th Cir. 2019) ........................................20

*United States v. Lewis,*
157 F.4th 415 (5th Cir. 2025) ........................................................25

*United States v. Lutz,*
154 F.3d 581 (6th Cir. 1998)...........................................................26

*United States v. Matthews,*
31 F.4th 436 (6th Cir. 2022) ...........................................................26

*United States v. Palma,*
58 F.4th 246 (6th Cir. 2023) ...........................................................28

*United States v. Pancholi,*
148 F.4th 382 (6th Cir. 2025) .........................................................45

*United States v. Reed,*
163 F.4th 338 (6th Cir. 2025) .........................................................32

*United States v. Richards,*
164 F.4th 508 (6th Cir. 2026) .........................................................32

*United States v. Robinson,*
99 F.4th 344 (6th Cir. 2024) ...........................................................23

*United States v. Sanders,*
106 F.4th 455 (6th Cir. 2024)(en banc) .................................. 32, 37

*United States v. Sherman,*
168 F.4th 417 (6th Cir. 2026) .........................................................19

*United States v. Strouse,*
286 F.3d 767 (5th Cir. 2002)...........................................................35

*United States v. Thompson,*
758 F. App'x 398 (6th Cir. 2018) ....................................................37

*Wong Sun v. United States,*
371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) ....................24

## Statutes

18 U.S.C. § 1591 ............................................................... 7, 28, 30

18 U.S.C. § 1591(a) ......................................................... 17, 23, 27, 28, 30

18 U.S.C. § 2260A ....................................................................... 7, 16, 19

18 U.S.C. § 2421A ............................................................................... 29

22 U.S.C. § 7101(a) ............................................................................ 29

October 2000 as the Victims of Trafficking and Violence
    Protection Act of 2000 .................................................................. 28

Pub. L. 106-386, 114 Stat. 1464 (2000) ............................................ 28

## Other Authorities

Rule 16 ................................................................................. 37, 38, 44

Rule 29 .................................................................................... 2, 25

Rule 33 .................................................................................. 26, 27

## JURISDICTIONAL STATEMENT

This Honorable Court has jurisdiction to hear this matter pursuant to 28 United States Code § 1291, as there has been a final adjudication and sentence imposed by a United States District Court on December 12, 2025. (R.339, Judgment PAGE ID # 3261) A timely notice of appeal was filed with the district court on December 15, 2025. (R.340, Notice of Appeal PAGE ID # 3270) The Government filed its cross appeal notice on December 31, 2025. (R.354, Notice of Appeal PAGE ID # 3481)

## STATEMENT REGARDING ORAL ARGUMENT

Giles requests oral argument. Giles's claim related to the need for a new trial on the remaining counts once Count 4 of the indictment was dismissed may be better explored in oral argument.

Respectfully requested,

/s/ _____

Kevin M. Schad
Attorney for Appellant

## STATEMENT OF THE ISSUES

1. Because there is a real danger that the jury was influenced by the allegations in Count 4 of the indictment, which was dismissed post-trial, the court should have granted a new trial on the remaining counts.

2. The court should have granted a Rule 29 on Count 3 of the indictment, as there was no proof that Giles used force, threats of force, fraud, or coercion that caused AV-1 to engage in commercial sex acts.

3. Defense counsel's allegations that there were misstatements in the search warrant application warranted a Franks hearing.

4. Because of numerous, ongoing problems with obtaining discovery, Giles was denied a fair trial.

## STATEMENT OF THE CASE

In 2021, Appellant Kevin Giles lived at a house located on Pembroke Avenue in Detroit, Michigan. He rented rooms in that house to other people. Among those people he rented rooms to were M.G. (Melon or MV-1), S.O. (Shailynn or MV-2), and T.G. (Tayjia or AV-1). According to the Government, Giles coerced or forced those persons to commit acts of prostitution, by which he helped set up the "dates" and shared in the profits.

Melon testified that when she was 16 or 17 (in March 2021), she moved into Giles' residence with her baby. (R.303, Trial PAGE ID # 2127)  Melon recalled meeting Giles at an "after hours" club, where she told him that she was 19. (PAGE ID # 2140)  Giles charges her "400-500$" for rent. As she had no income, she would "do dates" (i.e., prostitution) and provide Giles half of her income. (PAGE ID # 2126)  She performed these "dates" in a room off the kitchen, where a stripper pole was installed. (PAGE ID # 2128)  Giles assisted her with these acts of prostitution by putting ads on "listcrawler" and "megapersonals". (PAGE ID # 2130)  She also would post for herself at times. (PAGE ID # 2156) Giles would take calls for her, and set the prices for different acts. (PAGE ID # 2132)  He would also buy her lingerie and condoms. He also bought groceries for her and her child, as well as diapers.

(PAGE ID # 2136)  Melon testified that she had sex with Giles "two or three" times, which she considered part of staying at the house. (PAGE ID # 2128-29) Melon admitted that if she had not lied to Giles about her age, he would not have let her move into the house. (PAGE ID # 2166)

Shailynn, a friend of Melon's, moved into Giles' home a short time after Melon arrived. (R.303, Trial PAGE ID # 2133)  She was 16 when she moved into the residence. (PAGE ID # 2036)  As she recalled it, Giles charged her "300-400$" for rent. (PAGE ID # 2050)  Shailynn also performed "dates" to raise money for the rent. Shailynn testified that Giles' nephew came over the house and helped set up internet ads for the dates (PAGE ID # 2059), and that Giles also helped her by posting ads. (PAGE ID # 2060)  Giles instructed her to do her "dates" in the room off the kitchen, and Giles always "supervised" by interacting with the Johns. (PAGE ID # 2061)  Shailynn said that she paid Giles "whatever she felt like" out of the proceeds from the "dates." (PAGE ID # 2062)  She, Melon, and Giles went to an adult store, where they bought the stripper pole. She used that stripper pole during some of her "dates." (PAGE ID # 2065)  At some point, Shailynn had a specific conversation with Giles as to her age, but Giles did not tell her to stop prostituting despite this knowledge. (PAGE ID # 2069)

4

Eventually, after a few weeks, she and Melon moved out. Giles and Shailynn often argued (PAGE ID # 2073), and Giles would yell at her from time to time. (PAGE ID # 2073) Shailynn admitted that she was not afraid of Giles (PAGE ID # 2110) and admitted to lying to police in 2021 when they began investigating Giles. (PAGE ID # 2096) Shailynn suffered a concussion in 2023, which she admitted affected her memory of events. (PAGE ID # 2096)

Tayjia met Giles in 2020 and moved in with him soon after. When she moved in, she continued her sex work, and Giles helped by posting for "Johns." (R.304, Trial PAGE ID # 2281) She was addicted to Percocet at the time: Giles would find her find sources for them. (PAGE ID # 2282) She eventually moved out in May 2020, because she and Giles argued about her charging him for sex. (PAGE ID # 2286) But in the spring of 2021, she contacted Giles again, and asked to move back in. (PAGE ID # 2291) They arranged that she would pay a percentage of each "date" to Giles as rent. Giles again helped her by posting ads. (PAGE ID # 2293) This time, she engaged in sex with Giles without asking for payment. (PAGE ID # 2297) As before, Giles helped her obtain Percocet. (PAGE ID # 2302)

Meanwhile, Child Protective Services (CPS) had received a complaint that Melon was living at Giles home, and being sex trafficked. (R.303, Trial

PAGE ID # 1982) CPS worker Lianna Harris visited Giles home on April 20, 2021; however, both Melon and Shailynn had already moved out. She took pictures of the residence, which pictures included the stripper pole. (R.303, Trial PAGE ID # 1988)  Harris told Giles about the sex trafficking complaint: Giles explained that he was told both Melon and Shailynn were 19, and in any event, any sex trafficking by them occurred outside the home. (PAGE ID # 2002)

Based on Harris's investigation, federal officers sought and obtained a search warrant for Giles' residence, which they executed on April 24, 2021. Together with viewing the stripper pole, officers noted and seized used condom wrappers, seven cell phones, and several video cameras that were placed around the home. (R.304, Trial PAGE ID # 2199-2206)   Both Giles and Tayjia were present for this search.

A few days later, FBI Agent Szczygiel returned to the residence to give back some items they had seized, including cell phones. Tayjia was present, but stated that she could not unlock the storm door to let him in. (R.313, Trial PAGE ID # 2734)  Later, on May 20, 2021, Szczygiel received a call from Tayjia stating that she was in distress. He, along with several other officers, went to Giles' home and retrieved her and her belongings from the home.

(PAGE ID # 2740)  This incident led officers to obtain a second warrant for Giles' residence, which they executed on May 28, 2021. They found other cell phones which were seized. They also seized another video camera. (R.304, Trial PAGE ID # 2233)

This investigation led to an indictment filed in the Eastern District of Michigan charging Giles with two counts of sex trafficking of a minor, in violation of 18 U.S.C. § 1591; and one count of sex trafficking an adult through force, threats of force, fraud, or coercion, in violation of 18 U.S.C. § 1591. (R.17, Indictment PAGE ID # 41)  This indictment was superseded on February 17, 2022 to add a count of committing a felony offense pursuant to 18 U.S.C. § 1591, while being required to register as a sex offender, in violation of 18 U.S.C. § 2260A. (R.60, Superseding Indictment PAGE ID # 269)

From early in the case, Giles complained that he was not able to review the discovery. At a hearing on September 16, 2021, defense counsel (who was removed by the end of the hearing) admitted that they had only sent part of the discovery to Giles. They informed the court they were sending it in "batches," but stopped when Giles sought to fire them. (R.77, Hearing PAGE

ID # 392)  The Government also noted that Giles would be unable to have access to some discovery under a protective order. (PAGE ID # 401)

By April 27, 2022, new counsel stated that Giles now had a copy of all discovery that was not within the protective order. (R.369, Motion Hearing PAGE ID # 3650)  But Giles explained that some of the evidence had been "tampered" with – for instance, Giles indicated that one of his phones had him listed as "Big Poppa Kevin," but he never used that moniker. (PAGE ID # 3649)  Giles renewed this complaint at a hearing held on August 11, 2022. (R.365, Hearing PAGE ID # 3545)

Giles' complaints about discovery continued into the next year. At a hearing held on March 20, 2023, Giles informed the court that although defense counsel gave him a hard drive to access the discovery, the password didn't work and he could not access it. (R.158, Hearing PAGE ID # 825) Defense counsel stated that he had provided "everything" to Giles, but that there were accessibility problems. (PAGE ID # 842)  Giles also specified that CPS had made a recorded interview of he and Tayjia on April 24, 2021, but that was not in the discovery. (PAGE ID # 863)

On July 6, 2023, Giles, now acting pro-se with standby counsel, moved to dismiss the indictment based on discovery violations. First, Giles stated that

although the Government took 5 cameras from his house, that they only provided footage from two of them. (R.164, Hearing PAGE ID # 892)  He indicated that his prior counsel had informed him that counsel had seen footage that showed that Taylia was not locked in the home, as the Government suggested – the footage showed her ordering and receiving a food order. (PAGE ID # 894) Giles said that each of the video cameras had memory cards in them, so all 5 should have footage. (PAGE ID # 908)  Giles also confirmed that he was interviewed by a second CPS worker and asked for that interview. (PAGE ID # 914)

By the next pretrial, held on October 13, 2023, the case had been reassigned from retiring Judge Roberts to Judge Berg. At that hearing, Giles focused on the Wyze camera which was the subject of the second search, and the lack of video evidence from that camera. The Government informed the court that this camera had no memory card, and so no footage could have been retrieved from it. (R.367, Pretrial PAGE ID # 3598) Defense counsel contradicted this statement – he stated that other parts of the discovery showed still images which could only have come from video from that camera. (PAGE ID # 3609)  As counsel explained "The problem has been that the Government has said they don't exist, we've turned everything over, there's no

video, there's nothing. Well, we have now found, as Mr. Giles says and I'm still going through it now, after this – hundreds of images that could have only come from SIM cards, given the Government's statements." (PAGE ID # 3610) The Government responded "With respect to the May 28th search warrant, there was one Wyze camera facing out from Mr. Giles' window, so facing outside of the house. This is what the case agent stated, there was no memory card inside of that. So no footage that I'm aware of from my entire work on this case, in almost three years, exists from that camera." (PAGE ID # 3619) The court found that there was no discovery violation and denied the defense's motions. (PAGE ID # 3621)  The court also denied the defense request to obtain old jail calls between Giles and his former counsel, which showed discussion of the missing video footage.

The defense then requested that the Government provide the identity of the CPS worker, and disclose evidence of the second CPS worker that interviewed Giles. According to Giles, the second CPS worker had him sign some papers. (PAGE ID # 3629)  The court held that it was not the Government's duty to identify or disclose the second CPS worker and denied defense's requests. (PAGE ID # 3631)

Between that hearing and March 21, 2024, counsel discovered a conflict of interest, and had to remove himself from the case. Giles made another motion for self-representation. At a hearing held on March 21, 2024, Giles specified he would accept counsel's assistance if he could get help with the ongoing discovery issues. (R.375, Hearing PAGE ID # 3763)  New counsel said that he had received discovery from former counsel, but that it was "not complete," so he was requesting additional copies from the Government, as well as obtaining the file from Carter, Giles' first attorney. (PAGE ID # 3767)

The court held a final hearing on all of Giles' discovery and other issues on June 27, 2024, where he allowed Giles to reiterate his complaints. Giles showed the court a still picture from the discovery which he claimed showed that the Wyze camera had been accessed by the Government, and that footage from that camera existed. (R.371, Motion Hearing PAGE ID # 3698)  In response, the Government stated that it could not speak for the picture shown by Giles, but reiterated to the court that the Wyze camera had no memory card. (PAGE ID # 3699)  The Court again found that the Government had committed no misconduct, had destroyed no evidence, and had turned over all discovery. (PAGE ID # 3703)

Giles brought up again the fact that he was interviewed by a second CPS worker. Giles contended that he tried to identify this person through CPS, but they would not give him the information. However, if the Government provided Giles' name and date of birth, CPS would provide the information. (PAGE ID # 3704)  The Government contended that the information was "not in their possession," as the CPS does not constitute part of the prosecution team. The court ordered the Government to provide CPS with the information about Giles, to find out if the report exists. (PAGE ID # 3709)

Another pretrial was held on August 23, 2024. Giles again chose to represent himself. At that hearing, the Government disclosed "As part of our trial prep, we went to the FBI's offices and reviewed the physical exhibits. We pulled out a Wyze camera that had been recovered during the federal search warrant on May 28th, 2021. The case agent had previously informed us that that Wyze camera did not contain an SD card. When we looked at the exhibit, we found an SD card. That same day I emailed [defense counsel] Mr. Gonek and updated him. We also obtained a federal search warrant to review that SD card." (R.271, Pretrial PAGE ID # 1497)  The Government argued that the failed disclosure was unintentional; however, Giles pointed out that both he

and former counsel had identified this evidence for over a year. (PAGE ID # 1502)  The Government later filed a report, contending that the FBI agent erred in not looking at the camera, and "mixed it up" with another one. (R.218, Response PAGE ID # 1253)

Counsel again withdrew from the case, and Giles was appointed yet another new counsel. The court held another pretrial hearing on February 4, 2025, to address any outstanding defense complaints. Giles was permitted to address the court directly but was limited in the time he could argue. Giles first argued that his case must be dismissed, as the officer had told the grand jury that he was taking AV-1's (Taylia) Percocet pills, and selling them back to her. (R.277, Motion Hearing PAGE ID # 1532)  The Government admitted that this information was given to the grand jury, and that it was incorrect; however, the Government argued that the agent was relying on what was told to him by AV-1 at the time.   Giles also suggested that the agent lied to the grand jury about AV-1's clothes being strewn about his front yard – bodycam evidence showed this was not the case. The Government argued that, even if this were a misstatement to the grand jury, it was not material to probable cause. (PAGE ID # 1540)  The court denied dismissal on these grounds.

Giles next re-raised the issue of obtaining jail call records between he and his former counsel, Carter. Giles contended that there was still missing video that Carter had viewed. (PAGE ID # 1550) The Government in response stated that the random still shots were thumbnails from an ADT camera which were no longer available. (PAGE ID # 1555) The Government also shared that it has spoken with defense counsel Gonek, and Gonek told them that he had spoken with former counsel Carter, who in turn stated that all the evidence he did see was incriminating. (PAGE ID # 1556) The court then denied this request.

Giles next objected to a search the Government made on one of his phones in 2024. Giles also re-emphasized that he never called himself Big Poppa Kevin, and therefore someone added content to the phones. (PAGE ID # 1562) The Government denied adding any evidence to the phone downloads. The court informed Giles that the reason he has been having trouble with discovery was not because of the Government, but the decisions Giles had made regarding counsel. (PAGE ID # 1572) The court denied any remaining claims.

The week before trial, defense counsel asked for the "raw data" from Giles' phones. (R.366, Pretrial PAGE ID # 3584) Defense counsel wanted to

meet with his expert to clear up any lingering issues. Trial began on July 15, 2025. On the second day of trial, defense counsel informed the court that he had received the raw data dump, and that the defense expert was reviewing while trial went on. (R.303, Trial PAGE ID # 1961) Defense counsel, by the end of trial, revealed that they were not calling their phone expert. (R.313, Trial PAGE ID # 2782)

Together with the testimony from MV-1 (Melon), MV-2 (Shailynn), and AV-1 (Taylia), the jury heard from several police officer witnesses who discussed the two search warrants executed on Giles' residence. The jury also was permitted to hear several lengthy extractions from Giles' and the victims' phones, including text messages that seemed to be setting up prostitution visits. FBI agents were permitted to testify that, in their opinion, the text messages represented prostitution "dates." (R.304, Trial PAGE ID # 2210, R.305, Trial PAGE ID # 2472) FBI Agent Szczygiel was permitted to read in text messages from Shailynn in which she accused Giles of a being a "child rapist." (R.313, Trial PAGE ID # 2667)

The defense did not present a case, and the matter was submitted to the jury on July 23, 2025. On that same date, the jury returned a verdict of guilty as to all four counts of the indictment. (R.307, Jury Verdict PAGE ID # 2578)

15

On August 27, 2025, counsel moved for a new trial or for judgment of acquittal on all counts. (R.317, Motion PAGE ID # 3015) On December 5, 2025, the district court denied the judgment of acquittal and request for new trial on counts one through three; however, the court found that because Giles was not required to register as a sex offender under Michigan law at the time of the offenses, his conviction under 18 U.S.C. § 2260A must be vacated. (R.334, Order PAGE ID # 3252)

Sentencing occurred on December 8, 2025. The court determined that the advisory Guidelines range was 360 months to life, based on an adjusted base offense level 39, criminal history VI. (R.381, Sentencing PAGE ID # 4087) After hearing arguments from both parties, including objections about the content of the PSR by Giles, the court imposed a sentence of 17 years incarceration, to be followed by 10 years supervised release. (PAGE ID # 4130)

# SUMMARY OF THE ARGUMENT

## I.

After trial, the district court determined that Giles' conviction on count 4 of the indictment needed to be vacated. But because count 4 was tried with the other counts, the jury heard that Giles was a registered sex offender. The court erred in not granting a new trial on the remaining counts, given the prejudice Giles suffered because of count 4 being part of the trial process.

## II.

The Government failed to prove that Giles used force, threats of force, fraud, or coercion that caused AV-1 to engage in commercial sex acts, or that Giles' conduct otherwise fell within the ambit of 18 U.S.C. § 1591(a). Further, because AV-1 was an adult at the time the crime was alleged to have occurred, and the Government did not allege that she was enslaved, the prosecution could not be brought under 18 U.S.C. § 1591(a). Thus, his conviction on count 3 must be vacated.

## III.

Giles pointed out a false statement in the warrant application that was crucial to the probable cause determination. The court erred in not holding a Franks hearing on this matter.

## IV.

The Government's failure to timely turn over discovery, despite Giles' consistent requests, denied Giles a fair trial.

ARGUMENT

## I. AFTER DISMISSING COUNT 4, THE DISTRICT COURT SHOULD HAVE DETERMINED THAT RETROACTIVE MISJOINDER REQUIRED A NEW TRIAL ON THE REMAINING COUNTS

After trial, the district court correctly determined that Giles' conviction on count 4 of the indictment needed to be vacated. However, the court erred in not granting a new trial on the remaining counts, given the prejudice Giles suffered because of count 4 being part of the trial process.

**Standard of Review**

This Court reviews "the denial of a motion for new trial for an abuse of discretion, granting a new trial only where the 'interest of justice' so requires." *United States v. Sherman*, 168 F.4th 417, 438 (6th Cir. 2026).

The Government prosecuted Giles on the theory that he had coerced two minors and an adult to commit sex trafficking acts in his home. These comprised counts one through three of the indictment. Count four, which was added in a superseding indictment filed eight months after the initial indictment, charged that Giles committed counts one and two of the indictment while being required to register as a sex offender, in violation of 18 U.S.C. § 2260A. (R.60, Superseding Indictment PAGE ID # 269) After trial,

19

the court determined that this count must be vacated, as the sex offender registration process in Michigan had been found to violate ex post facto. (R.334, Opinion PAGE ID # 3251)  This resulted in a retroactive misjoinder of counts, and Giles was denied a fair trial by admission of the evidence on count 4 during the trial.

"Retroactive misjoinder refers to circumstances in which the joinder of multiple counts was proper initially, but later developments ... render the initial joinder improper. [citations omitted]. To succeed on a retroactive misjoinder claim in which a defendant alleges that the prejudicial 'spillover' of otherwise inadmissible evidence influenced the jury's decision on the remaining counts, the defendant must show either 'compelling prejudice' or that the prosecutor acted in 'bad faith' in bringing the charge." *United States v. Jackson*, 918 F.3d 467, 481 (6th Cir. 2019). Factors to consider, in determining whether the spillover of the improperly presented evidence on count 4 influenced the jury's decision on the remaining counts, include: "whether spillover evidence would incite or arouse the jury to convict on the remaining counts, whether the evidence was intertwined, the similarities and differences between the evidence, the strength of the government's case, and

the ability of the jury to separate the evidence." *Dale v. United States*, 517 F. App'x 421, 423 (6th Cir. 2013).

The evidence on count 4 would have aroused the jury's passion. The jury heard that Giles was a "Tier III" offender, the most serious type under Michigan law. (R.314, Trial PAGE ID # 2948)  The jury was told that Giles needed to register for "his lifetime." (PAGE ID # 2951)  The jury was also told that his prior conviction involved penetration. (PAGE ID # 2955)

The evidence on this count could also not be separated from the other charges. The main theory of the defense was that, even though Tayjia, Melon, and Shailynn committed acts of prostitution in his home, that it was a mutual arrangement, and that Giles never forced anyone to do those acts. But hearing that Giles was already a registered sex offender, with a prior involving penetration, would have influenced the jury's determination of the defense presented.

Finally, it is telling that the Government chose to present Jenelle Schkade, the sole witness as to count 4, as the last witness to the jury. The Government intended that the last evidence the jury heard was that Giles was a registered sex offender and had previously committed a "Tier III" felony. Saving the most powerful evidence for last is a standard in a prosecutor's playbook. It is

no coincidence that this evidence was presented when it was – thus its importance to the case overall was highlighted by the Government's decision to present it as the finale.

In sum, the jury should have never heard the evidence that Giles was a registered sex offender, or the details related to his prior conviction. This evidence improperly spilled over on the remaining counts, denying him a fair trial on those counts. The district court therefore abused its discretion in not granting a new trial on the other counts.

## II. THE CONVICTION ON COUNT 3 OF THE INDICTMENT MUST BE VACATED

The Government failed to prove that Giles used force, threats of force, fraud, or coercion that caused AV-1 to engage in commercial sex acts, or that Giles' conduct otherwise fell within the ambit of 18 U.S.C. § 1591(a). Thus, his conviction on count 3 must be vacated, and a new trial held on the remaining counts.

### Standard of Review

This Court reviews "de novo a challenge to the sufficiency of the evidence." *United States v. Deakins*, 152 F.4th 693, 705 (6th Cir. 2025).

"When we review insufficiency challenges, we ask whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Betro*, 115 F.4th 429, 443 (6th Cir. 2024). In making this review, this Court will not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury," and will "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Robinson*, 99 F.4th 344, 353 (6th Cir. 2024). However, a conviction "cannot rest upon mere

conjecture and suspicion." *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 415, 9 L. Ed. 2d 441 (1963).

### A. The Government failed to prove force, threats of force, fraud, or coercion as to AV-1

Count three charged that Giles, by "force, threats of force, fraud, and coercion" caused AV-1 to engage in commercial sex acts. The Government failed to prove this element.

Giles did not use force or threats of force to compel Taylia (AV-1) to engage in her acts of prostitution; the evidence shows that she sought out Giles and asked for his assistance to help her market herself. The term force as used in this statute is given its ordinary colloquial meaning. *United States v. Ford*, 821 F. App'x 742, 747 (9th Cir. 2020). "Force" applies to the forcing of participation in sex act itself. See *Moore v. Rubin*, 160 F.4th 271, 291 (2d Cir. 2025). There is no evidence that Giles engaged in force, or the threat of it, to persuade AV-1 to participate in prostitution.

There is also no evidence that Giles used any fraud in order to obtain AV-1's consent to engage in prostitution. Finally, Giles' actions with AV-1 did not involve coercion. "Coercion includes 'threats of serious harm to or physical restraint against any person,' and 'any scheme, plan, or pattern intended to

24

cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person.'" *United States v. Lewis*, 157 F.4th 415, 424–25 (5th Cir. 2025).

In denying Giles' Rule 29 motion, the district court found that four facts showed that Giles used coercion to force AV-1 into prostitution. These were: that AV-1 was "practically homeless," had a child, had an addiction to Percocet, and had cancer – all facts Giles know. (R.334, Opinion PAGE ID # 3229)  Second, the fact that AV-1 had sex with Giles upon her moving back into his residence. *Id.* The court also relied on the fact that AV-1 testified that she "felt" that Giles was "in control." *Id.* And finally, the court relied on the text messages that showed that Giles facilitated her "dates."

None of these facts, by themselves or together, show coercion as it is defined in the statute. "As used in the statute, 'coercion' means 'any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person.'" *United States v. Aldridge*, 98 F.4th 787, 795 (6th Cir. 2024). The above four facts, at most, showed that AV-1 felt Giles was "in control," but don't show that her failure to act would then result in serious harm. Nor are

there any acts or words by Giles that evinced his intent in this regard. There simply was no evidence of coercion, and this conviction must be vacated.

**B. The verdict was against the manifest weight of the evidence**

Alternatively, the conviction was against the manifest weight of the evidence.

"A reversal based on the verdict being against the manifest weight of the evidence is proper when the government has presented sufficient evidence to convict, but the judge disagrees with the jury's resolution of conflicting evidence." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). "When a party challenges a jury verdict as being against the manifest weight of the evidence, we ask whether a 'reasonable juror could reach the challenged verdict.'" *United States v. Ballinger*, 155 F.4th 671, 674 (6th Cir. 2025). "A trial judge faced with such a motion must 'take on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice.'" *United States v. Matthews*, 31 F.4th 436, 448 (6th Cir. 2022).

Giles preserved this issue by requesting a motion for new trial pursuant to Rule 33. Giles submits that the above arguments prove that, even if there were a "scintilla" of evidence supporting the second element of the offense, no

reasonable juror could have reached a guilty verdict on this count. Instead, the jury likely relied on the fact that AV-1 had cancer as a basis for finding she was coerced by Giles – but this is not a proper basis for conviction. There was no evidence that Giles used her affliction as a tool for coercion. At a minimum, the court should have ordered a new trial on this count.

Further, based on the conviction on this count being improper, a new trial is warranted on the remaining two counts. Giles adopts by reference those arguments made in section I of this brief regarding retroactive misjoinder, and notes that as to this count, had it not been part of the indictment, the jury would never have heard evidence related to Tayjia's cancer diagnosis and struggles (PAGE ID # 2265), that Giles helped her obtain illegal Percocet (PAGE ID # 2282), and that Giles had threatened her to the extent that she called the FBI for rescue. (PAGE ID # 2319) These comments biased the jury against Giles and therefore influenced the jury's verdict as to counts one and two.

### C. A conviction under 18 U.S.C. § 1591(a) where the victim is an adult but not a subject of slavery is improper

Giles finally submits that, because Tayjia (AV-1) was an adult at the time the crime was alleged to have occurred, and the Government did not allege

that she was enslaved, the prosecution could not be brought under 18 U.S.C. § 1591(a).

"To be legally sufficient, an 'indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of the crime.'" *United States v. Palma*, 58 F.4th 246, 249 (6th Cir. 2023). Giles first submits that Congress intended that 18 U.S.C. § 1591 be used for minor victims of sex trafficking. Therefore, because AV-1 was an adult victim, Giles could have not violated that statute.

Start with the title of 18 U.S.C. § 1591. It is named "[s]ex trafficking of children or by force, fraud, or coercion." The title reflects Congress's clear intent that this crime applies to the sex trafficking of children, not adults. The Supreme Court "has long considered that 'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Dubin v. United States*, 599 U.S. 110, 120–21, 143 S. Ct. 1557, 1567, 216 L. Ed. 2d 136 (2023).

Second, the legislative history establishes that any adult victim must be the victim of slavery. The statute was initially promulgated in October 2000 as the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"). Pub. L. 106-386, 114 Stat. 1464 (2000). The TVPA sought to "combat trafficking in

28

persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." 22 U.S.C. § 7101(a). In support of the TVPA, Congress made many findings relating to the "modern form of slavery" of trafficking in persons. *Id.* § 7101(b). Thus, Congress never intended this statute to reach purely intrastate forms of prostitution.

Giles would note that, in an unpublished decision, a panel of this court held that 1591(a) does apply in part to adult victims. See *United States v. Afyare*, 632 F. App'x 272, 276 (6th Cir. 2016). Beside the fact that this opinion is not binding on this Court, the panel conceded that there were problems with the statute as applied to adults, in that when there is no fraud, force, or coercion, and a victim over 18 is involved, the statute does not provide for any punishment *if* the statute is read to apply to adults. *Id.* at 278. But by continuing to determine that the statute did apply to adults, despite this glaring problem, that panel ran afoul of the axiom that "courts should avoid interpreting statutes in a manner that could result in 'absurd' outcomes." *Reichert v. Kellogg Co.,* 170 F.4th 473, 485 (6th Cir. 2026).

Arguably, the Government could have brought a prosecution under 18 U.S.C. § 2421A, which criminalizes using the mean of interstate commerce to

promote the prostitution of another. But they did not. And because 18 U.S.C. § 1591(a) does not criminalize the conduct alleged, the conviction must be vacated.

"[I]t is 'incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'" *Bond v. United States*, 572 U.S. 844, 858, 134 S. Ct. 2077, 2089, 189 L. Ed. 2d 1 (2014). Here, Congress's intent in 18 U.S.C. § 1591 was to protect minor, not adult victims. This Court should find that the statute could not be applied to AV-1 and dismiss count 3.

## III.   THE COURT SHOULD HAVE HELD A FRANKS HEARING

As part of the motion to suppress evidence obtained from Giles' residence as part of a search warrant, defense counsel alleged that the search warrant affidavit contained knowing false statements. The district court never addressed this issue; however, a Franks hearing was warranted on this claim.

**Standard of Review**

This Court reviews de novo whether a Franks hearing is warranted. *United States v. Brown*, 732 F.3d 569, 575 (6th Cir. 2013).

In his application for a search warrant of Giles' residence, officer Strunk informed the issuing magistrate that Giles admitted to a Michigan CPS worker that both MV-1 and MV-2 rented rooms from him in April 2021, and "that both MV-1 and MV-2 were engaging in commercial sex acts inside and outside of the residence and then using the proceeds to pay Giles" rent. (R.71, Motion to Suppress Exhibit 1, PAGE ID # 320)  Not only was this statement false, but Strunk knew it was false at the time he wrote it. As this false "admission" was key to deciding whether to issue the search warrant, the district court should have held a Franks hearing when it was called to their attention.

Criminal defendants have the ability "to challenge the sufficiency of an executed search warrant by attacking the veracity of the affidavit supporting the warrant." *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008), Known as a "Franks hearing," *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the initial step requires that a defendant "make a 'substantial preliminary showing' that the affidavit contains a knowing, intentional, or reckless falsehood." *United States v. Sanders*, 106 F.4th 455, 471 (6th Cir. 2024)(en banc). Second, the defendant must "show that the affidavit couldn't have established probable cause without such falsehoods." *United States v. Richards*, 164 F.4th 508, 519 (6th Cir. 2026). Once these two conditions are met, a defendant is entitled to an evidentiary hearing on his claim. *United States v. Ardd*, 911 F.3d 348, 353 (6th Cir. 2018).

To obtain a Franks hearing, a defendant "should specify the portions of the warrant he claims are false, state the reasons for that claim, and either provide reliable witness statements or explain their absence." *United States v. Reed*, 163 F.4th 338, 355 (6th Cir. 2025) To prove a "reckless falsehood," a defendant must present evidence "that at the time the officer swore out the affidavit, she knew of or possessed information that contradicted the sworn assertions." *Butler v. City of Detroit, Michigan*, 936 F.3d 410, 419 (6th Cir.

2019). As to a material omission, "a defendant must prove that an officer omitted the information 'with an intention to mislead' (not just with recklessness) and that the omission of the information was 'critical to the finding of probable cause.'" *United States v. Davis*, 84 F.4th 672, 682 (6th Cir. 2023).

Giles met this standard. The statement that "Giles stated that both MV-1 and MV-2 were engaging in commercial sex acts inside and outside of the residence and then using the proceeds to pay Giles" was false; Giles only told the CPS worker that they engaged in sex acts outside his home. Further, Strunk knew that this statement was false when he put it in the search warrant application: defense counsel informed the district court "there's an E-mail from the CPS worker to the agent that states that Mr. Giles when being interviewed by the CPS worker, when asked how did the girls pay him rent, he reported that they would prostitute in cars outside of the home, but never inside of his home because he did not allow it." (R.365, Motion Hearing PAGE ID # 3533)  This was later born out through the trial testimony of Lianna Harris, the state CPS investigator. She testified that when she interviewed Giles, he admitted that the girls prostituted themselves outside the home, but

he did not allow them to do that conduct inside his house. (R.303, Trial PAGE ID # 2002)

This false statement would have affected the probable cause determination. An admission by Giles that MV-1 and MV-2 were using his house for prostitution would have given any magistrate probable cause. But had the magistrate accurately been informed that Giles only admitted to those acts outside his home, a nexus between the crime and the place to be searched dissipates.

Giles would also note that the use of erroneous information in the prosecution was not limited to the search warrant application process but also permeated the grand jury process. At the grand jury, the agent testified that Giles was taking AV-1's Percocet pills and selling them back to her in exchange for sex work. He also told the grand jury that when they removed AV-1 from the house, Giles had strewn her clothes all over the front yard. (R.277, Motion Hearing PAGE ID # 1532-33) Neither of these allegations were true. Perjury before a grand jury is of course "a serious criminal offense." *Rehberg v. Paulk*, 566 U.S. 356, 367, 132 S. Ct. 1497, 1505, 182 L. Ed. 2d 593 (2012). And "a conviction knowingly 'obtained through use of false evidence' violates the Fourteenth Amendment's Due Process Clause." *Glossip v.*

*Oklahoma*, 604 U.S. 226, 246, 145 S. Ct. 612, 626, 221 L. Ed. 2d 90 (2025).
Perjury "knowingly sponsored" by the government can be remedied by
dismissal of the indictment. See *United States v. Strouse*, 286 F.3d 767, 771
(5th Cir. 2002). "This Circuit applies a strict standard for dismissal of an
indictment because of alleged prosecutorial misconduct before the grand jury."
*United States v. Azad*, 809 F.2d 291, 294 (6th Cir. 1986). "The prejudicial
inquiry must focus on whether any violations had an effect on the grand jury's
decision to indict." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263,
108 S. Ct. 2369, 2378, 101 L. Ed. 2d 228 (1988). The district court ultimately
determined that any misstatements by the agent were not "knowingly" made
or were not material to the grand jury's charging decision. (R.277, Motion
Hearing PAGE ID # 1544)  However, these errors in the agent's testimony
provide even more context for why the court should have held a Franks
hearing when confronted with yet additional "misstatements" in the search
warrant application.

The district court ultimately failed to address the Franks claim. The
court was bound to address this claim on the merits, and Giles submits that
there was ample evidence to support a Franks hearing. Giles requests that this

Court remand this case with instructions to hold a Franks hearing on this claim.

**IV. BECAUSE OF IRREGULARITIES IN THE DISCOVERY PROCESS, GILES WAS DENIED A FAIR TRIAL**

As part of the discovery process, the Government was required to provide the defense, among other matters, with all evidence they obtained from the search of Giles' residence. They did not, despite Giles' many requests. The failure to turn over such evidence denied Giles a fair trial.

**Standard of Review**

A district court's decisions related to the discovery process are review for abuse of discretion. *United States v. Harney*, 934 F.3d 502, 508 (6th Cir. 2019). When the failure to turn over evidence results in a Brady violation, review is de novo. *United States v. Thompson*, 758 F. App'x 398, 403 (6th Cir. 2018).

Federal Rule of Criminal Procedure "Rule 16 is the primary means of discovery in criminal cases . . . . [It requires] disclosure of government documents and objects that are 'material to preparing the defense;' 'intend[ed]' for 'use' in the government's 'case-in-chief at trial;' or were 'obtained from or belong[ ] to the defendant.'" *United States v. Sanders*, 106 F.4th 455, 472 (6th Cir. 2024)(en banc).

Apart from Rule 16, the Government has certain obligations pursuant to *Brady v. Maryland.* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). To prove a Brady violation, the defendant must show: "(1) the existence of favorable evidence, either exculpatory or impeaching; (2) that the evidence was suppressed; and (3) that the suppression resulted in prejudice." *Chancellor v. Geelhood*, 168 F.4th 388, 402 (6th Cir. 2026).

### A. Evidence from the Wyze camera

Officers performed two search warrants on Giles' residence – one on April 24, 2021, and a second one on May 28, 2021. On the first search, officers seized multiple cell phones, as well as four cameras. On the second search, the Government claimed that one other camera (a Wyze camera) was seized. (R.164, Hearing PAGE ID # 904) Giles explained that each of the five recovered cameras had SD cards in them and requested footage from them. The Government only turned over evidence on two.

Giles made numerous requests, spanning years, requesting specific video footage he claimed was on the Wyze camera seized on the second search. On July 6, 2023, he informed the court that his prior counsel, Michael Carter, had told him that he (Carter) had viewed footage that showed that Taylia was not locked in the home, as the Government suggested – the footage showed her

ordering and receiving a food order. (R.164, Hearing PAGE ID # 894) Giles said that each of the video cameras had memory cards in them, so all 5 should have footage. (PAGE ID # 908)

This was not only addressed by Giles himself, but it was also raised by at least one of Giles' counsels. At a hearing held on October 13, 2023, Giles' then counsel Mr. Mihas informed the court that parts of the discovery showed still images which could only have come from video from that camera. (R.367, Pretrial PAGE ID # 3609)  As counsel explained "The problem has been that the Government has said they don't exist, we've turned everything over, there's no video, there's nothing. Well, we have now found, as Mr. Giles says and I'm still going through it now, after this – hundreds of images that could have only come from SIM cards, given the Government's statements." (PAGE ID # 3610)

Every time Giles or counsel tried to address this issue, the Government denied the existence of this evidence. On May 23, 2023, the Government asserted "[d]uring the May 28, 2021 federal search warrant execution, the case agent observed a Wyze security camera at Mr. Giles' front window facing outward. However, this Wyze security camera had no memory card, and the FBI agents who recovered it have not been able to recover any footage from this camera." (R.118, Supplemental Brief PAGE ID # 622)  This statement is

telling – it does not state that the FBIs position was that there was no SD card; rather, it alleged that the FBI attempted to recover footage from that camera, and were not able to do so.

The matter was again addressed by the Government at a hearing on October 13, 2023. The Government at that hearing informed the court that this camera had no memory card, and so no footage could have been retrieved from it. (R.367, Pretrial PAGE ID # 3598)

In May 2024, Giles moved to dismiss based on Brady and discovery violations, keying in on the failure to turn over video evidence. The Government was rather incredulous in its response to this motion, informing the court that "Giles is simply mistaken.  The footage that he seeks is not in the government's possession, nor has it ever been." (R.204, Response PAGE ID # 1115)

On June 27, 2024, the court held another hearing where Giles again raised this concern. This time, Giles showed the court a still picture from the discovery which he claimed showed that the Wyze camera had been accessed by the Government and had images. (R.371, Motion Hearing PAGE ID # 3698) In response, the Government stated that it could not speak for the picture

shown by Giles but reiterated to the court that the Wyze camera had no memory card. (PAGE ID # 3699)

The Government ultimately did not acknowledge the existence of, or disclose this evidence, until August 23, 2024. At that hearing, the Government finally admitted: "As part of our trial prep, we went to the FBI's offices and reviewed the physical exhibits. We pulled out a Wyze camera that had been recovered during the federal search warrant on May 28th, 2021. The case agent had previously informed us that that Wyze camera did not contain an SD card. When we looked at the exhibit, we found an SD card. That same day I emailed Mr. Gonek and updated him. We also obtained a federal search warrant to review that SD card." (R.271, Pretrial PAGE ID # 1497)

The Government in court below specified that the failure to disclose this evidence was one of inadvertence: the FBI agent made a simple mistake – and the SD card in the Wyze camera was not "found" until August 2024. The district court accepted this response. But the problem with this answer is that it is inconsistent with the other evidence. First, Giles stated several times that his former counsel, Michael Carter, saw the video. If it was undiscovered at the time, how could Carter have seen it? Second, at the October 13, 2023 hearing, defense counsel Mihas also confirmed that he had viewed still images

41

captured from the video. Again, there can be no explanation of Mihas identifying still images from a video in October 2023 on an SD card that was not "found" until August 2024.

In addition, the Government's responses to the multiple inquiries for this evidence do not lend themselves to the account that no one ever looked for the memory card. Their responses instead indicate that they did review the evidence, and the video did not exist. It is beyond the pale to believe that Government attorneys and agents would be so incompetent as to never look for the requested evidence, and make strong statements, as officers of the court, that it did not exist.

Giles submits that this is not merely a case of a simple mistake. Rather, given the evidence, the Government kept this evidence from him for years. As such, his motion to dismiss the indictment based on discovery violations was well taken and should have been granted.

## B. The second CPS worker

Giles further submits that the Government erred in not disclosing the identity of the second CPS worker and disclosing statements he made to that worker.

On March 30, 2023, Giles first identified that CPS had made a recorded interview of he and Tayjia on April 24, 2021 through a second CPS worker, but that was not in the discovery. (R.158, Hearing PAGE ID # 863) Giles renewed this request at a hearing on October 13, 2023. According to Giles, the second CPS worker had him sign some papers. (R.367, Pretrial PAGE ID # 3629) The Government stated that they were unaware of a second CPS interview. (PAGE ID # 3600) The district court specified that it was not the Government's duty to identify or disclose the second CPS worker and denied defense's requests. (PAGE ID # 3631)

Giles renewed this request at a hearing held on June 27, 2024. Giles contended that he tried to identify this person through CPS, but they would not give him the information. However, if the Government provided Giles' name and date of birth, CPS would provide the information. (R.371, Motion Hearing PAGE ID # 3704) The Government asserted that the information was "not in their possession," and that CPS did not constitute part of the prosecution team. The court ordered the Government to provide CPS with the information, and to find out if the report exists. (PAGE ID # 3709)

It does not appear that this second CPS worker, or the report, was ever ultimately disclosed to the defense. Giles submits that this discovery problem,

along with the other ones set forth in this argument, combined to have denied Giles the right to a fair trial.

### C. Evidence from cell phones

Giles also complained about problems with discovery relating to his cell phone records. First, The Government also failed to disclose, until September 2024, evidence from two cell phones it had seized in 2021. (R.238, Response PAGE ID # 1352)  Second, Giles complained several times that some evidence on his cell phones had been altered. Giles explained that one of his phones had him listed as "Big Poppa Kevin," but he never used that moniker. (R.369, Motion Hearing PAGE ID # 3649)  He maintained this objection at a hearing held on February 4, 2025, (R.277, Motion Hearing PAGE ID # 1562), but it was ultimately never resolved by the district court.

### D. Remedy

Given all the above, the court should have imposed sanctions on the Government. "Rule 16 gives district courts 'considerable' leeway in choosing a remedy for a violation of its requirements," including the ability to "order belated discovery, 'grant a continuance,' suppress the evidence, or impose any other 'just' remedy." *United States v. Daniels*, 163 F.4th 992, 1005 (6th Cir. 2026). While suppression of evidence is considered a "drastic" remedy, where

the evidence shows that the discovery violation was "willful," it is an appropriate remedy. *United States v. Pancholi*, 148 F.4th 382, 391 (6th Cir. 2025).

Here, given the persistent problems with discovery, as well as the Government's misrepresentations to the district court, the appropriate remedy, although drastic, should have been dismissal of the charges.

CONCLUSION

Giles asks that this Court vacate his convictions and dismiss the indictment with prejudice, or in the alternative, remand for further proceedings consistent with this Court's order.

Respectfully submitted,

JOSEPH MEDICI
Federal Public Defender SDOH

/s/ _____

Kevin M. Schad
Attorney for Appellant
Appellate Chief
Office of the Federal Public Defender
Southern District of Ohio
250 E. Fifth St.
Suite 350
Cincinnati OH 45202
(513) 929-4834
Fax (513) 929-4842
Kevin_schad@fd.org

# CERTIFICATE OF COMPLIANCE

Counsel for Appellant hereby certifies that the foregoing brief complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 32(a)(7)(B). The relevant portions of the above brief contain 9593 words in Century Schoolbook (14-point) type. The word processing software used to prepare this brief was Microsoft Office 365.

/s/ _____

Kevin Schad
Counsel for Appellant

# CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2026, I electronically filed the above with the Clerk of the United States Court of Appeals for the Sixth Circuit using the CM/ECF system, which will send notification of such filing to the following at their email addresses on file with the Court:

Assistant United States Attorney Sarah Alsaden

/s/

Kevin Schad
Attorney for Appellant

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

In accordance with 6 Cir. R. 30, Appellant designates as "Relevant District Court Documents" the documents below filed in the district court and available via that court's electronic CM/ECF system:

| District Court Docket Number | Page ID # | Description of Document |
|---|---|---|
| 1 | 1-12 | Complaint |
| 17 | 41-45 | Indictment |
| 60 | 266-272 | Superseding Indictment |
| 71 | 298-328 | Motion to Suppress w/ Exhibit |
| 74 | 358-381 | Response in Opposition |
| 77 | 391-410 | Transcript Hearing 9-16-21 |
| 79 | 417-430 | Order Denying Motion to Suppress |
| 96 | 518-519 | Pro-se Motion to Compel Discovery |
| 102 | 538-539 | Order Clarifying Standby Counsel |

| 104 | 542 | Order Concerning Discovery |
|---|---|---|
| 108 | 549-550 | Motion to allow Independent Review |
| 112 | 559-568 | Joint Report Regarding Discovery |
| 118 | 619-623 | Supplemental Brief |
| 120 | 626-627 | Order |
| 131 | 690-692 | Motion to Dismiss |
| 158 | 822-869 | Transcript Hearing 3-30-23 |
| 164 | 889-933 | Transcript Hearing 7-6-23 |
| 165 | 940-966 | Transcript Hearing 7-7-23 |
| 166 | NA | Supplemental Brief on Gigilio |
| 198 | 1079-1081 | Motion to Amend |
| 199 | 1082-1088 | Motion to Dismiss |
| 200 | 1089-1095 | Motion to Compel |
| 203 | 1106-1111 | Response in Opposition |

| | | |
|---|---|---|
| 204 | 1112-1129 | Response in Opposition w/Exhibits |
| 221 | 1263-1265 | Motion Ineffective Assistance of Counsel |
| 223 | 1273-1277 | Motion to Remove Prosecutors |
| 238 | 1340-1363 | Response in Opposition |
| 266 | 1462-1468 | Order |
| 271 | 1479-1504 | Transcript Hearing 8-23-24 |
| 277 | 1529-1611 | Transcript Hearing 2-4-25 |
| 299 | 1703-1717 | Order Granting In Limine Motion |
| 303 | 1959-2166 | Transcript Trial 7-16-25 |
| 304 | 2181-2379 | Transcript Trial 7-17-25 |
| 305 | 2401-2520 | Transcript Trial 7-18-25 |
| 306 | 2521-2577 | Jury Instructions |
| 307 | 2578-2580 | Jury Verdict |
| 313 | 2603-2782 | Transcript Trial 7-21-25 |

| 314 | 2790-3000 | Transcript Trial 7-22-25 |
|---|---|---|
| 317 | 3015-3023 | Motion for New Trial |
| 321 | 3094-3109 | Response in Opposition |
| 334 | 3215-3252 | Opinion And Order |
| 339 | 3261-3269 | Judgment |
| 340 | 3270 | Notice of Appeal |
| 347 | 3317-3452 | Transcript Trial 7-23-25 |
| 365 | 3532-3547 | Transcript MTS Hearing 8-11-22 |
| 366 | 3554-3558 | Transcript Pretrial 6-27-25 |
| 367 | 3594-3636 | Transcript Pretrial 10-13-23 |
| 369 | 3644-3662 | Transcript Hearing 4-27-22 |
| 371 | 3694-3713 | Transcript Hearing 6-27-24 |
| 374 | 3743-3756 | Transcript Lafler Hearing 2-2-23 |
| 375 | 3761-3767 | Transcript Hearing 3-21-24 |

| | | |
|---|---|---|
| 378 | 4028-4038 | Transcript Hearing 12-4-25 |
| 380 | 4052-4075 | Transcript Hearing 1-10-25 |